Per Curiam:*
In June 1969 authorized officials of the Army Quartermaster Catalog Agency in Philadelphia accepted plaintiff’s resignation from his GrS-5 clerical job at a time when plaintiff, without knowledge of his superiors, was temporarily suffering from an exacerbation of a mild but chronic mental illness (schizophrenic reaction) *492 which — as corroborated by the testimony of psychiatrists for both parties at trial here — “precluded him from exercising free will, or from understanding the transaction,” in the language of Federal Personnel Manual (FPM) 'Supplement 752-1, sec. S2-2^(6), reading in full as follows:
(6) As stated earlier, the general principle is that an action is voluntary if the employee understands the transaction, is free to choose, is given a reasonable time to make his choice, and is permitted to set the effective date. Under this principle, the resignation of an employee whose mental condition precluded him from exercising free will, or from understanding the transaction, would be an involuntary resignation and thus void. When there is substantial medical and other evidence that an employee is non compos mentis, therefore, the agency should not encourage the employee’s resignation; instead, if the agency desires to separate the employee, it should initiate action to separate him by disability retirement or, in the alternative, by adverse action procedures.
Plaintiff sues for back pay on the theory that, under the quoted provision, his resignation was involuntary and therefore void. The Government’s alternative defenses are: (1) the resignation was voluntary; (2) if the resignation was involuntary by force of the FPM provision quoted above, the mental condition which induced his resignation persists chronically 'and precludes his employment in the position from which he resigned/was constructively discharged; and (3) plaintiff did not appeal to the Civil Service Commission and thus failed to exhaust his administrative remedies before coming to court.
Whether or not the quoted provision of the FPM was binding on the Army as a regulation (see Piccone v. United States, 186 Ct. Cl. 752, 762 n. 12, 770-74, 407 F. 2d 866, 871-72 n. 12, 876-79 (1969)), it states the proper standard which would and should be applied by knowledgeable employers. That standard, in view of the unanimous expert advice of psychiatrists for both parties, requires the plaintiff’s departure under the existing circumstances to be considered as “'an involuntary resignation and thus void.” There is no choice in the matter as there was in McGucken v. United States, 187 Ct. Cl. *493 284, 407 F. 2d 1349, cert. denied, 396 TJ.S. 894 (1969), where the plaintiff alternatively claimed but failed to prove that he was mentally ill at the time of 'his resignation. There the CSC’s determination that McGucken’s resignation was not involuntary was found to be supported by substantial evidence. Here, in contrast, all the evidence shows that the resignation was involuntary.
Next, defendant correctly paraphrases the familiar rule in this breed of case that before a Government employee may recover back pay for wrongful separation, he must show that he was ready, willing and able to perform the duties of the position from which he was removed for the period for which he seeks recovery. Graves v. United States, 176 Ct. Cl. 68, 76 (1966), and cases cited. We do not know when and if the plaintiff recovered sufficiently to return to work, but presumably from his point of view this was sometime prior to October 6,1969, when he formally requested a grievance hearing on the grounds that he was not responsible for his actions at the time he resigned. Plaintiff’s chronic condition appears to be one which waxes and wanes, having infrequent periods of exacerbation when he is not fully responsible for his actions, and prolonged periods of remission when he is fully able to perform the type of duties involved in the office which he left. We leave wholly to the proceedings under Pule 131(c) the issue of plaintiff’s readiness, willingness, and ability to perform during the period after his resignation, or any part of it, without making any determination at all on that question. An appropriate standard for considering this issue is set forth in Chapter 306, Subchapter 5 of FPM entitled “Employment of the Mentally Restored.” There a mentally restored person is defined as—
* * * one who has experienced some mental or emotional difficulty, has received professional treatment either in or outside of an institution and has been judged by competent medical authority as ready for return to his normal activities including employment.
Section 5-2a of Subohapter 5 states:
As a general rule, a history of mental illness is not disqualifying for Federal employment provided that re- *494 eovery has been certified by competent medical authority and the applicants are capable of performing the duties of the position without hazard to themselves or others. * * *
The quoted provisions of the FPM, including sec. S2-2g (6), swpm¡ convey a purpose that is both compassionate and practical. “Compassionate” because it treats a resignation— promptly sought to be retracted — of an employee while suffering from an exacerbation of chronic mental illness to be an involuntary act, and cautions the agency to take action other than accepting a resignation of such dubious volition. “Practical” because it behooves both the Government and its employees to salvage the work potential of a mentally handicapped person, the one by reducing relief rolls and retaining needed skills and experience, and the other by preserving the individual’s self-respect through permitting him to remain a useful, self-sustaining member of society within the limits of his chronic but controllable handicap. The principle applies even where, as in this case, the agency officials who accepted plaintiff’s resignation were not aware of his condition at the time, for the test is the employee’s actual condition rather than the employer’s knowledge of it.
Finally the Government contends that plaintiff failed to exhaust his administrative remedies. In response to plaintiff’s request on October 6, 1969, for a hearing under established grievance procedures, the agency advised plaintiff on October 28 that no basis existed for canceling his voluntarily submitted resignation, and that under applicable regulations the agency’s refusal to cancel the resignation “does not constitute the basis for a grievance or an appeal and, therefore, does not warrant a hearing.” It then knew of but refused to accept Dr. Eugene A. Jaeger’s statement of July 31 (finding 19(a)) that plaintiff was of unsound mind and that his judgment was impaired at the time he resigned his job, on the grounds that the agency was not aware of the condition at the time. The agency also stated that, although there was no regulation for filing an appeal of a resignation, if there were one it would be subject to the time limit of 15 days from the effective date of the action. Plaintiff’s attorney was like *495 wise told “We are aware of the fact that the Civil Service Commission on occasion has reviewed other agency actions in this respect but it is our understanding that they also place time limits on the submission of such appeals.” The clear implication was that time for appeal to the Commission had also expired.
It has been held in Ainsworth v. United States, 180 Ct. Cl. 166 (1967), that, where an agency summarily dismisses an employee and not only fails to inform him of his appeal rights but also affirmatively misleads him into believing he had no such rights by a misstatement to that effect in a separation notice, the employee’s failure to exhaust his administrative remedy is not fatal to a judicial action claiming back pay for wrongful dismissal. That is what happened in this case. The offer of the Civil Service Commission during the pendency of the instant suit to entertain plaintiff’s appeal out of time since “as a matter of course [the CSC] takes appeals where the allegation is that a resignation was involuntary by reason of unsound mind,” need not be accepted by the plaintiff if he has already proceeded along the judicial trail. Despite such preference by the plaintiff, however, the court does not lose its option either to retain and adjudicate the claim, or to suspend action and require the plaintiff to submit his claim for administrative consideration. The action of the court should be dictated by whichever option it deems would produce the most expeditious and appropriate result. In this case the retention of the claim by the court for the purpose of determining damages should produce much the same practical result as to have it considered administratively, for in the course of calculating the plaintiff’s monetary entitlement, if any, the court will have to determine on the basis of persuasive evidence the periods during which he has been able to perform the duties of his former job, as well as the credits against the recovery due to outside earnings, etc. Evidence already in the record on damages is insufficient for that purpose. Plaintiff is entitled to a judgment of liability accordingly, with the amount of recovery, if any, to be determined by remand to the trial commissioner pursuant to Rule 131 (c).
*496 FINDINGS OF FACT
The court, ¡having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follow :
1. Plaintiff, born in 1935 (and not a veterans preference eligible), entered Federal employment in November 1956 as a OS-2 file clerk in the Army Quartermaster Catalog Agency in Philadelphia, Pennsylvania. Thereafter he was promoted and served successively in the grade of GS-3 as a supply catalog clerk and stock control clerk, until October 20, 1961, when he resigned “to secure another job.”
2. From then until March 28, 1967, the plaintiff worked for various private employers as a salesman of tires, batteries and accessories for a tire company, salesman of men’s clothing, construction laborer, and as an information clerk and teller for Sy2 years with the Philadelphia Savings Fund Society.
3. From March 28,1967, when plaintiff reentered Federal service with a temporary appointment at Defense Industrial Supply Corps (hereafter DISC) as a GS-3 mail clerk to January 12, 1969, plaintiff held the following consecutive positions in the Federal service from the dates indicated:
April 12,1967, GS-3 clerk, Navy.
May 7,1967, GS-3 clerk, Navy.
September 9, 1967, GS-5 claims examiner, Social Security Administration.
July 14, 1968, GS-5 inventory management specialist, Marine Corps Supply Activity.
Plaintiff left his job with the Social Security Administration listed above to seek “a job more suited to my liking.” All of plaintiff’s jobs were in the Philadelphia area. His performance of them was satisfactory. He has never been fired from a job.
4. On January 12, 1969, plaintiff transferred to Defense Industrial Supply Corporation (DISC) as a GS-5 inventory management specialist, under a program designed to advance him after 2 years of satisfactory performance to a GS-9 journeyman inventory management specialist. During the first 3 months of his employment by DISC he was assigned *497 to tiie OGB supply branch, and underwent training in order to qualify him for his new responsibilities and spent his time on supply demand review, preparation of “buy” documents, preparation of correspondence, plus time on other projects. For the initial 3-montih period his work was rated as “standard.” In the evaluation report for that period plaintiff’s supervisor certified him as being capable to represent the activity on the outside, discuss material problems, understand the mission of DISC, understand and use advance procedures, and reported that he was cooperative with other employees, made good suggestions, worked on tasks independently, met deadlines, organized work well, and that his attendance was good and his appearance neat. During the period of plaintiff’s assignment to the supply branch of DISC his trainer was John Lynn, with whom he had a good working relationship.
5. On or about April 27, 1969, plaintiff was assigned to commodity branch OGC at DISC which he did not like as well, although the work was quite similar. At the time of the reassignment plaintiff was attending a computer systems training class. His first regular working day in the new branch was May 5, 1969. A Mr. Siniff was assigned as plaintiff’s trainer in the new branch.
6. On May 7, 1969, plaintiff refused to follow certain instructions of his trainer, Mr. Siniff, who reported the incident to his section chief, Mr. Sharpe. Plaintiff declined Siniff’s suggestion that he and Siniff confer with Sharpe, and proposed instead that Sharpe could see him at his desk if he wished. The matter was reported to Mrs. Parker, the 'branch chief, who scheduled a meeting with plaintiff, Siniff, and Sharpe later that morning.
7. Before the meeting suggested by Mrs. Parker could be held, the plaintiff had what was described by a witness as “a sort of convulsion” at his desk. Objectively, plaintiff sat in his chair, staring into space, talked to no one, and salivated at the mouth.[1] The dispensary was called. Plaintiff was placed on a stretcher and taken to the dispensary in an ambulance. He was examined there by a Dr. Strite, whose notes of the *498 interview report a “schizophrenic personality.” Dr. Strite telephoned plaintiffs psychiatrist, Dr. Eugene A. Jaeger, who advised that plaintiff could drive himself home, but recommended that he take a week off and confer with him on May 10. This information was posted by Dr. Strite on a medical card which was placed in plaintiff’s confidential medical file and kept at the dispensary.
8. Following his visit to the dispensary on May 7 as related in finding 7, plaintiff returned to his work area before going home and spoke to his branch chief, Mrs. Parker, to whom he apologized for taking sick. He told her that he felt fine but that the doctor had instructed him to rest at home for a few days. Plaintiff assured Mrs. Parker that he could drive himself home, and then did so.
9. Plaintiff had appointments with his psychiatrist, Dr. Jaeger, on May 10 and May 20,1969. Dr. Jaeger advised plaintiff that it would be satisfactory for him to return to work on or about May 14, 1969. He prescribed certain tranquilizer drugs, which he felt would enable plaintiff to function at his job. Plaintiff returned to work on May 14, 1969, and brought with him a sick leave certificate from Dr. Jaeger.
10. When plaintiff returned to work on May 14, 1969, Mr. Albert Eansom became his trainer. From then until June 9, 1969, plaintiff complained to his trainer about the workload in the OGC branch, and expressed the wish to be back in the OGB branch from which he had been transferred in April (finding 5). The workload was in fact heavy. Mr. Eansom considered plaintiff to be an “ordinary, complaining trainee.” Plaintiff’s performance was considered to be within the normal range for trainees, though he was perhaps not performing some of the more advanced tests which he should have been performing at that point in his training. There was, however, no reason or intention to have him separated.
11. On June 9, 1969, plaintiff suddenly informed his branch chief, Mrs. Parker, that he did not want to work there any more and was quitting. Pie refused to discuss the matter with her and walked off the job. The following day, June 10, Mrs. Parker telephoned plaintiff and inquired *499 whether he was coming back to work at DISC. Plaintiff stated that he was not. He indicated over the telephone that people at DISC were taking things from him that money can’t buy, and that he did not want to work with a group of homosexuals. The reference to homosexuality refers to purported conversations between Ransom and plaintiff in which the former is alleged to have spoken of perversions. At trial plaintiff testified in a general way to such conversations, which bothered him, but which Ransom denied in his testimony. Such conversations were not proved, and it is concluded that they were probably imagined by plaintiff.
12. The personnel office serving DISC treated plaintiff’s statements of June 9 and 10 as his oral resignation effective June 9, 1969. On June 19, 1969, a Notification of Personnel Action was processed and mailed to plaintiff, indicating the effective date of his resignation to be June 9,1969, and giving as reason for his resignation: “You stated you are resigning your position because you didn’t want to work here any more.”
13. On June 23, 1969, plaintiff returned to DISC. He requested his job back but was told that Mr. Michael Abbott, an employee relations specialist with the personnel office, wanted to see him for an exit interview. Plaintiff reported to and was interviewed by Mr. Abbott, and told him that he did not want to leave.[2] According to plaintiff, Mr. Abbott told him it would be better if he resigned, whereupon plaintiff asked, if he did resign, could he go to work for some other Government agency, to which Mr. Abbott is said by plaintiff to have replied there would be no problem at all. Mr. Abbott testified that on the occasion of the interview the plaintiff told him that he was unhappy with the reason given previously for his resignation, and said he wanted to change the reason. Whereupon plaintiff filled out a form giving as reason for the resignation: “To seek employment more in line with my experience and education.” Mr. Abbott denied telling plaintiff that it would be best for him to resign. He did not suggest to plaintiff that he take disability retirement or sick *500 leave instead of resigning. He was not 'aware of the reason for plaintiff’s sick leave the preceding month as described in findings 7 and 8. At the time of the interview on June 23, 1969, the plaintiff impressed Mr. Abbott with being well-mannered, quiet, and not abusive. There was nothing unusual in his appearance or demeanor. In the normal case of handling the separation of mentally disturbed employees, Mr. Abbott testified that the process would involve examining the employee, consulting his family, and “our course of action, officially, would be to go for disability retirement.” It is not normal to consult the employee’s medical record when conducting an exit interview. Such records are kept in the dispensary and are considered confidential (see finding 7). It is reasonable to believe that the personnel office knew of plaintiff’s “convulsions” on May 9, 1969 (findings 7 and 8), even though it may not have been aware of the contents of the plaintiff’s medical record maintained in the dispensary and of the entry therein that plaintiff had a “schizophrenic personality” (finding 7).[3] The medical record is not part of the individual’s official personnel folder, 'and the Federal Personnel Manual requires that it be kept confidential. Normally when a mentally incompetent employee is being separated the supervisors consult the agency medical officer for advice as to the employee’s mental condition.
14. On October 6, 1969, plaintiff requested a grievance hearing under Navy grievance procedures, on the basis that he was not responsible for his actions at the time he resigned, so that the resignation should be cancelled as being involuntary. On October 10,1969, the agency considered that “we had no substantial medical and other evidence to indicate that Mr. Manzi was not responsible for his actions at the time he submitted his resignation”, although the agency knew of but refused to accept Dr. Jaeger’s statement of July 31, 1969 (finding 19(a)) that plaintiff was not fully responsible for his actions at the time of his resignation. In any event the agency advised plaintiff’s attorney that there was no stipu *501 lated provision in the regulations for the filing of an appeal from a resignation, but if there were such an appeal would have to be filed within 15 days from the effective date of the action. Plaintiff’s attorney was also told by the agency: “We are aware of the fact that the Civil Service Commission has on occasion reviewed other agency actions in this respect but it is our understanding that they also placed time limits on the submission of such appeals.” On October 23, 1969, the defendant replied in part to plaintiff’s request of October 6 for a grievance hearing as follows:
* * * no basis exists for canceling Mr. Manzi’s voluntarily submitted resignation. In addition, under current Defense Supply Agency regulations (as a former Defense Industrial Supply Center employee these regulations apply to Mr. Manzi) management’s refusal to withdraw or cancel a voluntary resignation does not constitute the basis for a grievance or an appeal and, therefore, does not warrant a hearing. This decision does not preclude Mr. Manzi from submitting an application for reinstatement consideration.
The agency’s suggestion that plaintiff could apply for reinstatement was qualified by advice that there was no requirement that he be selected for employment, and that selection would be contingent on available vacancies, position requirements, and ceiling and budget restrictions. Plaintiff filed no administrative appeal of the agency decision denying the request for cancellation of his resignation. During the pendency of the proceeding in this court, and because of the Government’s First Affirmative Defense in its answer to the petition relating to the defendant’s failure to exhaust his administrative remedies, the defendant on June 16, 1970, advised plaintiff that it had ascertained from the Civil Service Commission that it “as a matter of course, takes appeals where the allegation is that a resignation was involuntary by reason of unsound mind.” The CSC offered to allow plaintiff’s appeal regardless of the expiration of time allowed for the appeal, but the plaintiff declined, preferring to pursue his court remedy.
15. There is no evidence as to plaintiff’s employment from June 23,1969 to November 1970, nor specific evidence as to *502 ■Ms efforts to seek employment.[4] Subsequent to November 1970 be worked as a factory laborer, in which capacity he was still engaged at the time of trial. Since November 1970' plaintiff has also worked as a cab driver, at first on a full-time basis of 54 hours per week, and later on a part-time basis of from 18 to 86 hours per week. In tMs latter capacity his services were satisfactory to his employer, he has had no accidents, and his employer intends to continue plaintiff’s employment. Plaintiff stated at trial that he prefers work involving physical activity, but also expressed a preference for work involving responsibility. TMs ambivalence is characteristic of schizophrenia. One of plaintiff’s trainers at DISC described the nature of plaintiff’s duties there as not routine clerical work, but work requiring a good amount of judgment, a description endorsed by stipulation of the parties at tr. 142.
16. The parties are in agreement that plaintiff’s outside earnings in 1969 were $4,042 and in 1970 were $3,303. They also agree that the annual earnings of a GS-5, step 2, Government employee, effective July 1, 1968, were $5,924; effective July 1, 1969, were $6,382; effective December 27, 1969, were $6,766; and effective January 1, 1971, were $7,169.
17. Plaintiff’s history of mental illness is documented in the record of this case back to 1957. In that year his family sent him to a psycMatrist, Dr. Durante, who gave plaintiff a series of electro-shock treatments as an outpatient at St. Agnes Hospital. Such treatments are usually given for severe depression or schizophrenia. In 1963 plaintiff underwent psychiatric treatments by Dr. Bongeovanni and/or Dr. Herbert Adler (the record is not entirely clear as to details), and it was recommended that he enter Plaverford State Hospital for treatment. He was apparently an outpatient there for an undisclosed period, and there met Dr. Eugene A. Jaeger, who was the hospital’s resident psychiatrist and who became plaintiff’s psycMatrist over a period of several years (finding 18). Sometime prior to June 1966 plaintiff also *503 consulted Doctors Luce and O’Neil, both, psychiatrists, who diagnosed plaintiff’s condition as “schizophrenic reaction.” Schizophrenia is one of the psychotic (not “neurotic”) illnesses.
18. Dr. Eugene A. Jaeger, referred to in finding 17, treated plaintiff at various times starting with June 23,1966, and as late as January 27, 1970, reported that plaintiff was still under medical care and making progress. In addition to treatments by Dr. Jaeger, plaintiff has been examined psy-chiatrically for the particular purposes of this litigation by Dr. Samuel C. Bullock (at plaintiff’s instance) and Dr. Stuart Wolfe (in defendant’s behalf), to determine his mental condition, with particular reference to the relationship between plaintiff’s mental condition and his resignation from his job on June 9, 1969, 'as described in findings 11 through 13 herein. The examinations of plaintiff by Doctors Bullock and Wolfe were on or about, respectively, February 21, 1970 and July 2, 1970. In essential respects the psychiatrists are not in disagreement as to their diagnoses of plaintiff’s condition, or as to the role it played in connection with plaintiff’s resignation. For example, Dr. Jaeger’s diagnosis was that plaintiff “obviously suffers from a schizophrenic illness of a chronic variety which waxes and wanes”, and his “prognosis should be termed ‘guarded.’ ” Dr. Wolfe diagnosed plaintiff as having—
* * * a chronic emotional disorder which is still present and best described as a borderline psychotic personality. This means that although he is not at present overtly and blatently psychotic he will under stress become and exhibit psychotic reactions. Conditions that would provoke this would be working close to other men. Frustration at work above 'and beyond Mm make him feel inadequate. Currently he still exMbits a tendency of suspiciousness and being cheated.
# # #
Mr. Manzi is not unemployable but would require continued psyoMatric treatment to help Mm stabilize Ms emotional reactions as they came up at work.
At tr. 239 Dr. Jaeger testified that plaintiff’s variety of scMzophrenia is one of the types which has a better *504 prognosis than some other types to recede as part of the maturing process.
19. The views of Doctors Jaeger, Wolfe, and Bullock as to the reference between plaintiff’s mental illness and his resignation described in findings 11 through 13 herein are as follows:
(a) Dr. Jaeger’s report of July 31,1969:
* * * Decently he became emotionally disturbed at which time he suffered from an exacerbation of his former illness. I feel his judgment due to this was greatly Impaired and that he resigned his job at a time when he was of unsound mind. I recommend a leave of absence until he stabilizes and then restoration of his job.[5]
(b) Dr. Jaeger’s report of January 27,1970, stated that at the time he examined plaintiff on May 10 and May 20, 1969, plaintiff—
* * * was experiencing a recurrence of his mental illness. At this time the Slness rendered him unable to work. * * * Subsequently he improved and was 'able to become employed.
At the present time January 1970] he is still under medical care and making progress.
(c) Dr. Wolfe’s report of July 17,1970:
To rephrase this in terms of your question: it is my opinion that Mr. Manzi has a chronic emotional disorder which was present before and during the period of June 9,1969 and June 23,1969 characterized by unusual sensitiveness, conflicts about sexuality, and exaggerated suspiciousness. This chronic emotional disturbance was definitely exacerbated to a more acute form as evidenced by his intense emotional reaction on May 7, 1969. His reaction to his trainer allegedly talking about sexual matters was extreme if in fact such conversations did occur. If they did not Mr. Manzi was even more disturbed and was psychotic at that time. In any event it is my opinion that Mr. Manzi was suffering an intensification of a basic chronic underlying emotional disorder between the period stated above. The fact that 'a layman considered Ids responses to be normal is insufficient psychiatric evidence of normality or abnormality. Mr. Manzi currently *505 would appear to be normal to the average person but still shows definite evidence of paranoid thinking. I would say at the least Mr. Manzi’s judgement [sic] was impaired to a considerable degree during the time in question.
(d) Dr. Wolfe’s testimony at tr. 43-44:
* * * I do feel that Mr. Manzi was under extreme emotional pressure at the time which interfered with his clear thinking and that this could have affected a sound judgment for his future. And, he may well have done things that, had he not been under this particular — did not have this particular disorder, he may not have done this without consulting other people or delaying it for some other time when he could have consulted a lawyer such as Mr. McDermott.
(e) Dr. Wolfe’s testimony at tr. 40: in response to a question on cross-examination “You say that when in June 9, of 1969, he submitted his resignation, that he was not then capable of completely understanding his act. Is that right?”, the witness replied “That’s correct.”
(f) Dr. Bullock’s report of his examination of plaintiff on February 21,1970:
* * * at the time of his resignation he was under exceptional pressure and his judgment was not adequate to make a decision for his future.
'CONCLUSIONS
20. When plaintiff submitted his resignation on June 9, 1969, he was not then capable of completely understanding his act; he was under extreme emotional pressure which interfered with his clear thinking and this could have affected a sound judgment for his future, by reason of being under the particular disorder. He was emotionally disturbed, suffering from an exacerbation of his former illness, a mental disorder known as schizophrenia; his judgment was greatly impaired and 'he was of unsound mind. His resignation was more determined by internal pressure than by any rational judgment, and he would probably not have resigned had it not been for Ms mental condition. It is reasonable to conclude that plaintiff remained under the same disability, differing only in degree, on June 23,1969.
*506 CONCLUSION OK LAW
Upon tbe foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to a judgment of liability, with the amount of recovery, if any, to be determined pursuant to Eule 181 (c).

This opinion incorporates the opinion prepared by Trial Commissioner C. Murray Bernhardt with modifications by the court.

 Psychlatrlcally this might be termed a catatonic phase of schizophrenia.

 At Tr. 84 the plaintiff testified: “I’d rather not go bach there”, meaning his last position at DISC. He was unable to state precisely why.

 This is apropos of the Government’s position (stated in plaintiff's exhibit 20) that at the time plaintiff’s resignation was acted on the agency had no substantial medical evidence to indicate that plaintiff was not responsible for his actions at the time. The Government considered the resignation to be voluntary.

 There is a reference, however, in defendant's exhibit T that plaintiff applied to the Post Office for a job but was turned down. Of. tr. 124. And a further reference in commissioner's exhibit 3 that plaintiff engaged in construction and canvassing work since October 1969. No details are available in the record.

 At tr. 221, however, Dr. Jaeger testified that he does not have enough evidence to advise whether plaintiff’s resignation was the product of a mental Illness.