Jervis W. McENTEE, Plaintiff,

v.

UNITED STATES, Defendant.

No. 92–768C.

United States Court of Federal Claims.

Dec. 3, 1993.

Steven M. Angel, Oklahoma City, OK, for plaintiff.

John S. Groat, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, DC, with whom were attorneys at the U.S. Dept. of Justice and the Acting Asst. Atty. Gen., Civ. Div., for defendant.

## OPINION

HORN, Judge.

Plaintiff, Jervis W. McEntee, a former United States Air Force Commander, brought this action seeking relief in the form of back pay and benefits, restoration to his former position, and correction of all applicable records for an alleged wrongful separation from the military and for a Line of Duty (LOD) determination in 1984. This case is now before the court on defendant's motion to dismiss for lack of jurisdiction because the plaintiff voluntarily retired from the United States Air Force. Defendant asserts that plaintiff's voluntary retirement bars his claims for back pay and allowances.

Plaintiff filed an opposition to defendant's motion to dismiss and a supplement thereto, to which defendant replied. Following an oral argument, plaintiff and defendant filed briefs in response to a July 28, 1993 court order, which requested the parties to provide additional information, relevant to the issue of whether plaintiff's separation from the military was voluntary or involuntary.[1]

Plaintiff asserts a cause of action based upon the LOD determination, and a claim based upon the actions of the Air Force Board of Corrections of Military Records ("AFBCMR"). Additionally, plaintiff argues that because he was subjected to an upcoming mandatory retirement date, his subsequent retirement from the military was involuntary.

Following a thorough review of all the pleadings submitted, the oral argument held on July 27, 1993, and the applicable law, this court concludes that plaintiff's resignation was voluntary and that this court, therefore,

---

1. In an affidavit plaintiff submitted to the court in August, 1993, plaintiff also alleged that as a dual status employee he should have been eligible for continuation of his military status, even after the thirty-year mandatory retirement date, until he became eligible for civilian retirement. According to plaintiff, however, the civilian employer sought to separate him from his civilian service because plaintiff's flying status was removed, making him no longer eligible to be a dual status employee, and no longer eligible for extended employment beyond the mandatory retirement date.

is without jurisdiction to entertain the claims asserted by the plaintiff. Accordingly, defendant's motion to dismiss is, hereby, **GRANTED.**

## BACKGROUND

Plaintiff was the commander of the 507th Tactical Fighter Squadron, a reserve unit of the United States Air Force. Prior to January 1984, plaintiff was diagnosed as having elevated blood pressure, labile type, and was temporarily disqualified from active duty flying status. Defendant's physician placed the plaintiff on a daily dosage of hydrochlorothiazide. The medication corrected plaintiff's condition within three (3) days, and he was allowed to return to active duty status. Plaintiff was permitted to resume his flight duties under a series of medical waivers.

On January 29, 1984, plaintiff suffered an incident of tunnel vision and appeared flushed. On February 4, 1984, the plaintiff experienced two similar incidents, occurring twenty minutes apart. Plaintiff experienced "tunnel vision, shortness of breath, and weakness which were compatible with near episode."

Following the second incident plaintiff was hospitalized from February 14 to February 17, 1984. Electrocardiographic and ventricalographic studies were performed on plaintiff. Dr. Jan Voda, a cardiologist, conducted a full examination and made a preliminary diagnosis of arteriosclerotic heart disease and urticarial reactions. Dr. Voda's conclusion confirmed Colonel Closner's statement that the "[e]vidence also reflects this is job related." As a result, plaintiff's flying status was suspended. A February 15, 1984 Physical Profile Serial Report determined that plaintiff was not qualified for worldwide duty. Subsequently, the defendant restricted plaintiff from duty for pay and points until his medical condition was resolved.

According to plaintiff, it was later determined that the preliminary diagnosis was in error, and that there was no significant blockage of the artery. In his affidavit, submitted as part of plaintiff's opposition to defendant's motion to dismiss, plaintiff states that a second electrocardiogram was conducted and there was no significant "Q-wave"

factor. Dr. Voda, who continued to monitor plaintiff, suggested that the first reading, which resulted in the preliminary diagnosis of myocardial infarction, may have been due to a "transient conduction defect." In plaintiff's affidavit attached to his opposition to defendant's motion to dismiss, McEntee also quotes from a September 5, 1984 letter, not included in the record, to the effect that:

> Syncopal episodes of uncertain etiology. No significant pathology was demonstrated. Patient does not have coronary artery disease. There is no evidence for arrhythmias or conduction system abnormality. These findings and his subsequent very good clinical progress strongly suggest the cause of his syncopal episodes was benign.

On March 17, 1984, the medical officer recommended a determination of applicant's condition as incurred "In Line of Duty." The physician rendered a diagnosis of "[s]yncope secondary to antihypertensive medication and stress induced urticaria" and "[a]rteriosclerotic heart disease manifest by abnormal electrocardiographic and ventricolographic studies." The medical testing reflected a narrowing of the anterior descending artery and abnormal left ventricular function.

Plaintiff's immediate commander recommended a finding of "In Line of Duty" on March 30, 1984. This finding was merely a recommendation and not a final determination. The appointing authority concurred with this recommendation on April 17, 1984. Plaintiff's medical records were subsequently forwarded to AFMSC/SGPA for a USAF-SAM evaluation on May 11, 1984. The Director of Professional Service, Office of the Command Surgeon, reviewed the informal determination and the Air Force Reserve (AFRES) Surgeon General's office questioned the previous LOD finding on May 16, 1984. According to this review, plaintiff's condition was not incurred in line of duty, and was not due to misconduct. Moreover, the event occurred while plaintiff was attending a Unit Training Assembly (UTA). The resulting May 16, 1984 memorandum from the Director of Professional Services, Office of the Command Surgeon, read:

1. Do not concur with LOD—yes. Recommend LOD—NO, Not Due to Own Misconduct IAW AFR 35–67 para 1–20c. Because his syncopal or near syncopal episodes of undetermined etiology cannot be classified as an injury, and the period in question was a UTA, this cannot be classified in line of duty.

2. If hypertension, artero sclerotic heart disease, medication, urticarial reactions or stress played any role in his episode of illness, the determination would remain the same. There is no evidence of an injury during the UTA, and only an injury could possibly be ruled in line of duty.

The memorandum cites to Air Force Regulation 35–67 ¶ 1–20(c) (AFR 35–67 ¶ 1–20), which states Not in Line of Duty, Not Due to Own Misconduct is the proper determination when "[a] USAFR ... member gets a disease while performing inactive duty training."

The Director of Professional Services, Office of the Command Surgeon recommended that the finding of "Not in Line of Duty, Not Due to Own Misconduct" was proper because the syncopal or near syncopal episodes of undetermined etiology could not be classified as an injury and the period in question was a Unit Training Assembly.

Subsequently, on May 21, 1984, the HQ AFRES Chief of Staff for Personnel changed the finding to "Not In Line of Duty, Not Due to Own Misconduct." The Chief of Staff stated that the AFRES Command Surgeon had advised that plaintiff's syncopal or near syncopal episodes of undetermined etiology could not be classified as an injury. Plaintiff was informed of this change on May 31, 1984. McEntee protested the changed determination in a June 25, 1984 letter to AFRES/DPAA. Plaintiff stated that the AFRES/DPAA lacked the authority to change the LOD determination, and he requested that his records be corrected to reflect an LOD determination of "In Line of Duty."

In response to a protest by the plaintiff, the Vice Commander, AFRES, ordered a formal investigation of the LOD determination on July 10, 1984. Plaintiff protested again in a letter dated July 12, 1984. On July 20, 1984, the defendant notified plaintiff that a final LOD determination had not yet been made in his case, and would not be made until after a formal investigation. In the same memo, defendant denied plaintiff's July 12, 1984 request for benefits, including continuation pay and allowances, based on the fact that plaintiff's case involved a disease and not an injury and cited 37 U.S.C. § 204(g) (1982 & Supp. II 1984). Plaintiff, then, appears to have reasserted his request for a correction of his records. The defendant responded on July 25, 1984 that any final determination would be made after a review of the formal LOD investigation.

The Chief, Aerospace Medical Consultants Division (AFMSC/SGPA), indicated on August 8, 1984, that plaintiff's case was reviewed by USAFSAM and AFMSC staff. Plaintiff was found to suffer from significant coronary artery disease, and that the disease should preclude plaintiff's return to flying duties. A Report of Investigation Line of Duty and Misconduct Status, dated August 8, 1984, stated that the medical diagnoses in the applicant's case was Hypertensive Cardiovascular Disease Syncope Etiology Undetermined and that the LOD determination should remain unchanged.

The reviewing and approving authority concurred in the finding on August 24, 1984, following plaintiff's physical at the Clinic for a Worldwide Duty. The Clinic Commander to AFRES/SG stated in a letter dated December 12, 1984, that plaintiff was fit for worldwide duty, but that he should be permanently grounded because of his past history, the etiology of which had never been determined. On December 14, 1984, the Director of Professional Services, HQ AFRES, also indicated that plaintiff was fit for worldwide duty, but disqualified for flying duties.

On March 19, 1985, defendant advised plaintiff that pursuant to 10 U.S.C. § 8851, he either would have to apply and transfer to the Retired Reserve, or be discharged from his Reserve appointment. In response, plaintiff submitted an Application for Transfer to the Retired Reserve, dated April 17, 1985, to be effective July 9, 1985. The request was approved on April 29, 1985.

Plaintiff submitted repeated Freedom of Information Act (FOIA) requests from 1984 to 1987. These requests sought to ascertain the basis for the negative LOD and flight status determinations. Unable to obtain the information requested, plaintiff filed his first request for correction of military records on February 23, 1988. Plaintiff then initiated an appeal to the Air Force Board for Correction of Military Records (AFBCMR) on October 3, 1988. Plaintiff requested a reversal of his disqualification from duty, reinstatement in the active reserve with placement in an appropriate position or his previous position, all back pay and benefits, and reversal of his flying status disqualification. In the alternative, plaintiff requested reversal of the LOD determination and, therefore, a restoration of all benefits which would derive from an "In Line of Duty" determination. The AFBCMR denied plaintiff's application on November 7, 1991.

On November 5, 1992, plaintiff filed the instant lawsuit in the United States Court of Federal Claims, seeking redress for an alleged deprivation of pay and benefits by defendant United States of America, by and through its subordinate military department and executive agency, the United States Department of the Air Force.

On January 4, 1993, defendant filed a motion to dismiss for lack of jurisdiction. In the motion, defendant also argued that the statute of limitations should bar plaintiff's claim relating to an unlawful personnel action, which occurred more than six years prior to the filing of the lawsuit. *See* 28 U.S.C. § 2501 (1988).

Following the granting of plaintiff's February 5, 1993 motion for enlargement of time, plaintiff's February 16, 1993 response was returned unfiled because it was untimely by five days, proof of service was not signed, the response was unsigned by the attorney of record, and the original was missing. Plaintiff again attempted a filing on March 12, 1993, which again was returned unfiled, because, once again, the response was untimely, proof of service was not signed, and the response was not signed by the attorney of record. Plaintiff filed a motion for leave to file out of time on March 23, 1993. This motion was granted by the court on March 31, 1993. Plaintiff's opposition to defendant's motion to dismiss was finally filed on the same date. On February 22, 1993, defendant filed a motion to stay the running of time for defendant's reply to plaintiff's opposition until after the plaintiff provided supplemental information in order to allow defendant to properly respond. On May 10, 1993, this court granted defendant's motion to stay.

On June 1, 1993, plaintiff filed a supplement to his response of March 31, 1993. Defendant filed its reply to plaintiff's supplemental response on June 4, 1993. On July 27, 1993, the court heard oral arguments on defendant's motion to dismiss. The issue of whether the defendant's separation was involuntary or voluntary was raised during the oral proceeding. Therefore, a court order dated July 28, 1993 required the plaintiff to respond to several court inquiries, including whether plaintiff's retirement was voluntary or involuntary. The plaintiff responded to this order on August 10, 1993, and the defendant filed a reply on August 24, 1993.

## DISCUSSION

■ Defendant's Motion to Dismiss alleges that plaintiff voluntarily retired from the military, thereby rendering this court without jurisdiction to entertain plaintiff's claims.

■ A motion to dismiss, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), based on a challenge to the jurisdiction of the court, requires that the court reach its decision based on the evidence presented by the parties. The Supreme Court and the United States Court of Appeals for the Federal Circuit both direct that: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir. 1989); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). When evaluating a motion to dismiss for

failure to state a claim, the court must presume all factual allegations in the complaint are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). *See also Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. A motion to dismiss should not be granted by the court "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989). Furthermore, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." 2A James Wm. Moore & Jo Desha Lucas, *Moore's Federal Practice*, ¶ 12.07[2.–5] (2d ed. 1992). The burden is on the plaintiff to establish the jurisdiction of the court. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 748; *Pasco Enters. v. United States*, 13 Cl.Ct. 302, 305 (1987); *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). Moreover, subject matter jurisdiction must be established by the plaintiff by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 748.

■ The applicable precedent is clear that the United States Court of Federal Claims only has jurisdiction to decide plaintiff's claim if the claimant's retirement from active military service was involuntary. *Sammt v. United States*, 780 F.2d 31 (Fed. Cir.1985); *Bergman v. United States*, 28 Fed.Cl. 580, 584 (1993). Resignations from the military are presumed to be voluntary, although a claimant may rebut this presumption. *Christie v. United States*, 207 Ct.Cl. 333, 338, 518 F.2d 584, 587 (1975). Stated otherwise, plaintiff bears the burden of establishing that the retirement was involuntary. *Christie*, 207 Ct.Cl. at 338, 518 F.2d at 587. The court, in determining whether the retirement qualifies as voluntary, is required

to examine all of the surrounding facts and circumstances. *Covington v. Secretary of DHHS*, 750 F.2d 937, 941–42 (Fed.Cir.1984). The purpose of the court's analysis is to determine whether the employee exercised free choice when deciding to resign. *Bergman v. United States*, 28 Fed.Cl. at 585; *Tannehill v. United States*, 18 Cl.Ct. 296, 300 (1989).

■ While a resignation is presumed to be voluntary, courts have held in a number of situations that the factual conditions precluded the plaintiff from formulating an independent decision. As carefully outlined in *Bergman v. United States*, the presumption of voluntariness can be adequately rebutted by a showing that the employee unsuccessfully attempted to withdraw his resignation before its effective date, *Bergman*, 28 Fed.Cl. at 585 (quoting *Cunningham v. United States*, 191 Ct.Cl. 471, 481, 423 F.2d 1379, 1384–85 (1970)); the employee resigned under time pressure, *id.* (quoting *Perlman v. United States*, 203 Ct.Cl. 397, 406, 490 F.2d 928, 932–33 (1974)); the employee was unable to comprehend the situation due to mental incompetence, *id.* (quoting *Manzi v. United States*, 198 Ct.Cl. 489, 492, 1972 WL 20799 (1972)); the government agency wrongfully caused the employee duress or inappropriately coerced the employee into resigning, *id.*, *see Christie*, 207 Ct.Cl. at 338–40, 518 F.2d at 587–88; or the government agency misrepresented information upon which the employee detrimentally relied. *Id.*; *see also Scharf v. Department of the Air Force*, 710 F.2d 1572, 1575 (Fed.Cir.1983).

In the above-captioned case, this court concludes that plaintiff voluntarily resigned from the United States Air Force. The plaintiff fails to offer any evidence to suggest that his resignation was involuntary. Further, plaintiff fails to present evidence that any of the exceptions to the presumption that his resignation was voluntary are applicable in his case.

The key facts in the instant case appear to be that by letter dated March 19, 1985, almost four months prior to plaintiff's scheduled retirement date, defendant notified plaintiff that his mandatory separation date

184

would be July 9, 1985, because on that date he would have completed 30 years and 30 days of service, and that in accordance with 10 U.S.C. § 8851 (1982, Supp. III 1985), plaintiff must transfer to the Retired Reserve or be discharged from his Reserve appointment. Included in an unpaginated and disorganized Appendix, attached to defendant's motion to dismiss, is what appears to be the operative document regarding whether or not plaintiff McEntee's resignation was voluntary. The document, dated April 17, 1985, is titled "APPLICATION FOR TRANSFER TO THE RETIRED RESERVE." Two boxes bear an X, the first reads "Request that I be transferred to the retired reserve effective on date indicated." The effective date is typed in as "9 July 1985." The second box which bears an X reads: "Request that my current enlistment which would normally expire on date indicated, be extended for an unspecified period contingent upon my transfer to the retired reserve." The adjacent box titled "normal expiration date" is filled in to read "9 July 1985." The document is signed by plaintiff. This application for transfer, filed by plaintiff on April 17, 1985, was signed three weeks prior to the response date of May 9, 1985, suggested in defendant's March 19, 1985 letter, and several months before the July 9, 1985 mandatory separation date.

Plaintiff has offered no evidence to suggest that he was coerced, misled, incapable of understanding, or that he attempted to withdraw his application for transfer. Because plaintiff responded to defendant's letter three weeks before the defendant's suggested response time to its March 19, 1985 letter, and several months before plaintiff's July 9, 1985 mandatory retirement date, it does not appear that the plaintiff was under undue time pressure to make a decision of whether or not to retire. *See Perlman v. United States*, 203 Ct.Cl. 397, 490 F.2d 928 (holding that less than one work day constituted time pressure).

Moreover, while plaintiff reported on August 17, 1984 that he had begun seeing a psychotherapist for severe depression, despair, and suicidal thoughts, there is no evidence in the record presented to this court,

nor has plaintiff claimed, that his mental capacity on April 17, 1985 rendered him unable to make a competent decision of whether or not to file an Application for Transfer to the Retired Reserve. The mental incompetence exception to the presumption that the resignation was voluntary was recognized in *Manzi v. United States*, 198 Ct.Cl. 489, 1972 WL 20799 (1972). However, that case is easily distinguishable on the facts because a doctor in *Manzi* stated that the employee was not fully responsible for his actions at the time of his resignation, and two other doctors concurred with this opinion. In addition, the employee in *Manzi* had an extensive history of mental illness, commencing at least ten years before, and continuing to the time of his resignation. In the absence of a doctor's opinion or other evidence which establishes plaintiff's mental incompetence, this court finds that plaintiff's mental condition did not preclude his ability to exercise free will or understand his decision to submit his retirement papers.

Likewise, there is no evidence in the record that plaintiff involuntarily accepted the defendant's terms, that the circumstances permitted no other alternative, and the circumstances were the result of coercive acts of the defendant. *Bergman v. United States*, 28 Fed.Cl. at 585 (quoting *Christie v. United States*, 207 Ct.Cl. at 338, 518 F.2d at 587). Plaintiff must establish all three elements in order to rebut the presumption of voluntariness. *Id.* (citing *Information Sys. & Networks Corp. v. United States*, 994 F.2d 792 (Fed.Cir.1993)). In fact, plaintiff has cited no authority nor has plaintiff clearly articulated any argument as to why his retirement should be considered involuntary.

The United States Court of Appeals for the Federal Circuit also has held that the voluntariness presumption cannot be overcome simply because the plaintiff was confronted with mandatory retirement. Extensive precedent has held that the "the exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative." *Sammt v. United States*, 780 F.2d at 32–33 (citing *Grissenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985); *Covington*, 750 F.2d at 942;

*Taylor v. United States,* 219 Ct.Cl. 86, 92, 591 F.2d 688, 692 (1979); *Christie,* 207 Ct.Cl. at 338, 518 F.2d at 587–88)); *Bergman,* 28 Fed.Cl. at 587. ("probability of removal does not convert a voluntary resignation into an involuntary one"). In *Heaphy v. United States,* 23 Cl.Ct. 697 (1991), *aff'd mem.,* 972 F.2d 1355 (Fed.Cir.1992), this court found that "[f]aced with the clear option of mandatory retirement or voluntary resignation, plaintiff chose, on his own, to resign his commissioned status, ..." and that this mandatory retirement date did not render his retirement involuntary. *Id.* at 702. In *Sammt,* the military employee was informed by the Army that he would be placed on the retired list unless he chose voluntary retirement. The *Sammt* court found the employee's impending mandatory retirement date irrelevant, since he voluntarily retired before that mandatory date. The court stated "[f]or whatever reason he chose that alternative [to retire] rather than await mandatory (involuntary) retirement, he made that choice, and we need not speculate on the reason. That choice deprives the Claims Court of jurisdiction over his claims." *Sammt,* 780 F.2d at 33.[2]

In the instant case, plaintiff McEntee voluntarily filed an Application for Transfer to the Retired Reserve before the mandatory date. As indicated above, the defendant notified the plaintiff, by letter dated March 19, 1985, that he would be discharged on July 9, 1985 if he did not transfer to the Retired Reserve before that date. Plaintiff chose to retire before the mandatory discharge date. This court has been presented with no evidence that the defendant provided the plaintiff with inaccurate information regarding his retirement,[3] coerced the plaintiff in any way, or that plaintiff did not possess the requisite

mental capacity to make an informed decision. Plaintiff was provided every opportunity to argue his case, including the court's order issued on July 28, 1993, which specifically invited the plaintiff to provide information on the issue of whether or not he voluntarily retired from the Air Force. The presumption that plaintiff McEntee's retirement was voluntary remains unchallenged.

## CONCLUSION

The law is clear that the United States Court of Federal Claims is without jurisdiction to entertain the claims raised in the case at bar. Plaintiff McEntee voluntarily retired from the United States Air force. The existence of an impending mandatory retirement date does not alter this rule. Therefore, after careful review of the record in the above-captioned case, the court, hereby, **GRANTS** defendant's motion to dismiss.

**IT IS SO ORDERED.**

---

2. The Federal Court Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), enacted on October 29, 1992, changed the name of the United States Claims Court to the United States Court of Federal Claims. The United States Court of Federal Claims is the successor to the United States Claims court in all respects.

3. On several occasions, plaintiff has tried to argue that the defendant failed to apprise him of his right to appeal the adverse LOD ruling. Although it is difficult to relate this issue directly to the question of whether plaintiff's decision to

retire was voluntary, the court notes the following statement of the United States Court of Appeals for the Federal Circuit:

> Further, it defies logic to say that a voluntary action by an employee is somehow made involuntary because of an agency's failure to advise of appeal rights or to counsel the employee on what constitutes involuntariness in a legal sense.

*Gaudette v. Dep't of Transp.,* 832 F.2d 1256, 1259 (Fed.Cir.1987).